UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
EVELYN GONZALEZ,

               Plaintiff,

   - against –                                                                              07 CV 4823 (RJD)(LB)

NEW YORK CITY TRANSIT AUTHORITY
and MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY,

               Defendants.
----------------------------------------------------------x
EVELYN GONZALEZ,

               Plaintiff,

   - against -                                                                              08 CV 3934 (RJD)(LB)

DANIELLE RUTTMAN, NEW YORK CITY
TRANSIT AUTHORITY, and
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY,

               Defendants.
----------------------------------------------------------x
EVELYN GONZALEZ,

               Plaintiff,

   - against –                                                                              08 CV 3935 (RJD)(LB)

TRANSPORT WORKERS UNION LOCAL 100,
BRIAN CLARKE, DANIEL O'BRIEN and
THOMAS LENANE,

               Defendants.
----------------------------------------------------------x

**MEMORANDUM & ORDER**

DEARIE, Chief Judge.

Between February, 2006, and September, 2008, plaintiff Evelyn Gonzalez, an Hispanic female, filed six employment discrimination lawsuits in this Court. Named as defendants in five of these actions are her employer, the Manhattan and Bronx Surface Transit Authority ("MBSTOA") and its parent corporation, the New York City Transit Authority ("NYCTA"), where plaintiff has worked on a day-to-day basis during much of the relevant period (together, the "Authorities"). The sixth suit is against Local 100 of the Transport Workers Union of Greater New York, AFL-CIO ("the Union"), which represents plaintiff for purposes of collective bargaining. In all six suits, plaintiff claims racial and gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; the three later-filed actions allege retaliation as well.

I dismissed the first three suits at the summary judgment stage. See Gonzalez v. New York City Transit Authority, et al., 06 CV 761 (RJD) (LB), 2008 WL 924934 (E.D.N.Y. Mar. 31, 2008) (hereinafter, "Gonzalez 1"), aff'd, No. 08 CV 2351, 2010 WL 774997, 369 Fed. Appx. 173 (2d Cir. Mar. 9, 2010) (hereinafter, "Gonzalez 1.5") (affirming "for substantially the same reasons set out in the [district] court's thorough and well-reasoned opinion of March 31, 2008"). Suits 4, 5 and 6 now face the same fate.

## DISCUSSION

### Summary Judgement Standards[1]

In Celotex Corp. v Catrett, 477 U.S. 317 (1986), the Supreme Court addressed "complete failure of proof" cases such as the three now before me:

---

[1] I assume the parties' familiarity with the law on Title VII and summary judgment recited in Gonzalez 1, 2008 WL 92493, at *6-8, which I incorporate here and supplement only where the particular point under discussion so requires.

> Rule 56 *mandates* the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

Celotex, 477 U.S. at 322-23 (internal citations omitted). Accord Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (defendant "need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial [but] need only point to an absence of proof on plaintiff's part"). I of course construe the combined records before me in the light most favorable to plaintiff, draw all reasonable inferences in her favor, and resolve any ambiguities her way. See Sledge v. Kooi, 564 F.3d 105, 108 (2d Cir. 2009) (internal citation omitted). I cannot, however, squeeze water from a stone, see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("some metaphysical doubt as to the material facts" does not entitle a plaintiff to proceed to trial on her claim), nor may I empanel a jury to hear a case supported only by allegations and rhetoric. See D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version of the events is not wholly fanciful").

**07 CV 4823 ("Gonzalez 4")**

I incorporate here the chronicle of facts recited in Gonzalez 1, to which the allegations in the subsequent suits serve as a sequel. In suit number 4, plaintiff alleges that illegal discrimination and retaliation occurred in September 2007 when defendants withheld from her a "promotion" (plaintiff's word) from the position of TSA III to that of Claim Examiner. The

relevant facts are not disputed: defendants *offered* plaintiff the position of Claim Examiner but plaintiff rejected the offer because it did not include a salary increase. Under the Authorities' salary guidelines, a change in job title is defined as a "promotion," and thus triggers a salary increase, only when the new title's minimum salary exceeds the former title's minimum salary by at least 8 percent. The change offered to plaintiff was lateral, rather than a promotion, because the base salary for a Claim Examiner is lower than the base salary of a TSA III, see Dkt. 1.2 at p. 17, "Promotions" (excerpt from MBSTOA Salary Guidelines Manual), as was fully explained to plaintiff at the time the offer was made. See Dkt. 1.2 at p. 15 (NYCTA Memorandum to Plaintiff dated September 11, 2007).

The most notable aspect of this claim is that, but for a change in date, from 2005 to 2007, these allegations are essentially the same as those on which I granted summary judgment in Gonzalez 1. See 2008 WL 924934, at *3, 8-10 (discussing identical facts and arguments). The discrimination branch of this claim, meritless the first time plaintiff raised it, borders on abusive litigation this time around.

Independent of the similarity between the claims in Gonzalez 4 and Gonzalez 1, on this record, I find nothing to support the allegations of Title VII misconduct. Nor has plaintiff pointed to anything untoward on defendants' part. While perhaps not commensurate with all that plaintiff might have wished for (because it did not include a pay increase), the offer to change her job title from TSA III to Claim Examiner, when "judged from the perspective of a *reasonable person in the plaintiff's position*, considering all the circumstances," Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 71 (2006) (emphasis added) (internal quotation and citation omitted), was not to her disadvantage. Among other things, (i) the offer emanated from a genuine need in the Property Damage Unit of the Law Department for someone

with Claim Examiner skills to assist Michael Francese, the Claim Manager; (ii) the memorandum officially extending the offer incorporated the express recognition (which plaintiff long complained was denied her) that plaintiff had already been performing Claim Examiner duties—above and beyond what was required of her as a TSA III—as well as praise for the quality of her performance of those duties; and (iii) despite the gap at the *minimum*-salary level between TSA III and Claim Examiner (which, as discussed, meant the transfer was "lateral" rather than a promotion), the offer provided that plaintiff herself would have maintained her then-existing salary, which exceeded the Claim Examiner minimum by far more than it exceeded the TSA III minimum. See generally Dkt. 1.2 at pp. 14-16.

What happened after plaintiff failed to accept the offer is, likewise, neither disputed nor corroborative of plaintiff's suspicions of discrimination. The position she rejected was filled through the ordinary posting procedure by Lena Reyes, an Hispanic female, whose offer, like the one previously extended to plaintiff, was classified as a "job title change" rather than a promotion in accordance with the salary compensation guidelines.[2]

Expressing the foregoing analysis in the language of Title VII's standards, defendants are entitled to summary judgment on both the discrimination and retaliation branches of plaintiff's claim because both theories require, as an essential element of a prima facie case, proof that

---

[2] No doubt plaintiff has regretted her decision, for the record reveals that she nevertheless applied, during the posting procedure, for the very position she had just let slip away, now a second time. If one can discern anything in these lawsuits in terms of motive, it may lie there. It may also lie somewhere near the fact that plaintiff, not entirely without reason, apparently perceives the duties of Claim Examiner to be worthy of a higher salary than those of a TSA III, presumably because they are more discretionary than the so-called "merely technical" duties of a TSA III. As a formal matter, however, the "motives" of plaintiff are not before me on these motions, so I need not probe further. Likewise, the lurking questions of what the differing pay scales between TSA III and Claim Examiner may reflect about how different skills are valued in today's labor marketplace, and what variables might nevertheless make a lower-base-salaried position more appealing to a particular employee, are not before me in these Title VII suits.

plaintiff has been subjected to a materially adverse employment action. See Kaytor v. Elec. Boat Corp., 609 F.3d 537, 552 (2d Cir. 2010) (elements of Title VII retaliation claim); Gonzalez 1, 2008 WL 924934, at *8-9 (elements of Title VII discrimination claim). Although "it is now clear that Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous,'" Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (quoting Burlington Northern, 548 U.S. at 53), under the circumstances presented here, plaintiff cannot show that what was offered to her was actionably adverse under Title VII, either for purposes of a discrimination claim, see Gonzalez 1, 2008 WL 924934, at *8-9 (same conclusion on comparable 2005 facts), or under the wider reach of retaliation. See Burlington Northern, 548 U.S. at 60-68.

Even assuming away this evidentiary deficiency, plaintiff's proof fails on other essential elements. For example, for discrimination, there must be some specific basis for inferring discriminatory intent, see Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004), but I find no such basis in this record. Plaintiff is "suspicious," but there is no reasonable basis for inferring, for example, that the salary guidelines, *and* the differing base salaries of the TSA III and Claim Examiner, which together made the transfer from the former to the latter ineligible for a salary increase, were all a façade to hide a race- or gender-based motive to deny plaintiff a raise.

As for retaliation, plaintiff must establish a "causal connection" between the protected activity and the "adverse" employment action, see Kaytor, 609 F.3d at 552, but here, the relevant events—the 2006 lawsuits (commenced in February, May and October) and the September 2007 job offer—are far too distant in time to give rise to the requisite inference of causality.[3] See generally Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001) (when plaintiff

---

[3] Nowhere does plaintiff seek to cast the allegedly adverse act (the September 2007 job offer) as retaliation for a specific prior lawsuit, but instead refers only collectively to "three other pending cases."

relies solely on temporal sequence, "the proximity must be very close;" endorses appellate holdings that periods of 3 months and four months were legally *in*sufficient). Cf. Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (interval sufficient where employee was fired 20 days after employer learned she had retained an attorney to pursue a gender discrimination claim; relies on earlier Second Circuit authority finding intervals of twelve days and "less than two months" sufficient at the prima facie stage).

In sum, while it always unfortunate when a litigant believes that she has been wronged, it is incumbent upon plaintiff to understand that she has the burden *to prove* what she alleges, and that mere allegations are not proof.[4]

---

[4] At her deposition she testified as follows:

Q: Why do you say it's retaliation, [what] facts do you base that on?
A: Failure to promote.
Q: Because you were offered a lateral transfer that constitutes retaliation, is that right?
A: No, it constitutes failure to promote me being Hispanic and a woman.
Q: So that is discrimination?
A: And failure to promote, this is failure to promote and retaliation, that's what the charge consists of, this shows that they will not promote me, it validates they refused to promote me I've been doing this job for six years.
. . .
Q: Other than what you've testified about how it's retaliation is there any other, is anything else that would constitute that would support the allegation, anything other than what you've testified already?
A: It is what it is.
Q: So no?
A: No what?
Q: There . . . are no other facts that you have to support your allegation of retaliation?
A: The other facts are my three other pending cases within the Federal District Court.

## 08 CV 3934 ("Gonzalez 5")

A. The Principal Discrimination and Retaliation Claim

In this action, the principal act of alleged discrimination and/or retaliation takes the form of disciplinary charges brought against plaintiff in October 2007. The allegations, however, are quite sweeping and not entirely consistent, and appear to claim that acts of a discriminatory or retaliatory nature occurred at several discrete junctures before, during, and after the charges themselves were issued. The material events are as follows:

By memorandum dated October 11, 2007, Daysy Otero, an Hispanic female and co-worker of plaintiff's, made the following complaint.

> On October 10, 2007 . . . an incident occurred that was very disturbing to me. I was at the vending cart on the 12th floor when [plaintiff] approached . . . and stood directly behind me. As she reached around my person, on the left, and leaned toward the icebox on the cart, she looked up and hissed "scarface."
>
> There are several incidents where[]upon [plaintiff] has harassed me either verbally or in writing. The first time I received a disturbing email dated January 20, 2004 . . On July 20, 2007, during the lunch period, I was exiting the building. As I approached the turnstile in the lobby to exit, [plaintiff] had entered the building and approached the turnstile next to the one that I was using. As we passed each other, she hissed "scar face." You may recall that I reported this incident to you. We decided not to take action at that time unless it occurred again.
>
> I am very concerned about the manner in which her behavior is escalating and intensifying in a threatening way toward me. Please advise as to the corrective action that will be taken and/or preventative steps that will be taken to ensure that [plaintiff] stops threatening/harassing me.

Plaintiff's supervisor Danielle Ruttman asked plaintiff to meet with her that same day to discuss the matter. An exchange of emails, increasingly escalating in tone, ensued. Plaintiff accused Ruttman of harassment and claimed she was "being framed;" Ruttman, for her part,

alerted plaintiff that her failure to meet and cooperate could subject her to disciplinary charges. On October 15 (the following Monday) plaintiff did appear at Ruttman's office, but did not stay long. The Union had been notified but did not send a representative,[5] and plaintiff, according to her later testimony, "did not feel comfortable to sit down or convey anything" to Ruttman. Ruttman then directed plaintiff to provide a written response to Otero's complaint, and plaintiff replied by again asserting that she was "being framed." At her deposition she testified that "being framed" meant that "[t]hey are using a Hispanic woman to get me who is also Hispanic because if [the] allegation of harassment was indeed in existence why I never heard of the allegation or saw it or if I was harassing an individual why, it's just suspicious."

On October 26, 2007, fifteen days after Otero lodged her accusation against plaintiff, MBSTOA issued formal disciplinary charges, as follows:

> On or about October 10, 2007, at 130 Livingston St., you harassed a fellow employee by calling her "Scarface." On October 15, 2007, you were insubordinate in that you were ordered to participate in an investigative meeting and you failed to comply. You were loud and disruptive, and you failed to cooperate with the investigation. This is conduct unbecoming an MBSTOA employee and in violation of Authority Rules and Regulations.

As a penalty, MBSTOA requested a suspension of 20 days.

After traveling through the multi-step grievance procedure, the matter went to arbitration ("step 4") on June 12, 2008 before Gayle A. Gavin.[6] Kenneth Page, a Union staff attorney, met

---

[5] Sued in Gonzalez 6 for allegedly breaching the duty of fair representation, the Union explains that, given the more than 10,000 disciplinary charges brought annually against its members, it customarily does not send a representative to such early, informal meetings.

[6] At "step 1," on November 8, 2007, neither plaintiff nor the Union appeared, and Ruttman, as Hearing Officer, sustained the charges and penalty. It later emerged, however, that the hand-delivery of the disciplinary charges to plaintiff was not accomplished until November 16, 2007. At the step 2 hearing on November 30, 2007, plaintiff appeared with a Union

-9-

with plaintiff on more than one occasion before the hearing to prepare and then represented her at the hearing itself. The arbitrator received testimony in support of the harassment charge from Otero, in support of the insubordination claim from Ruttman, and in denial of both claims from plaintiff; she then sustained only the insubordination charge. The arbitrator concluded that, "under the circumstances as presented," the penalty of suspension would be reduced from fifteen days to a single day (which plaintiff served on July 25, 2008).[7]

It is not entirely clear which event or combination plaintiff claims is the "materially adverse" employment action for purposes of the prima facie retaliation and discrimination claims. Plaintiff complains, at different points in her papers, about all of them, which by my inventory include: her co-worker's complaint about her, Ruttman's ensuing efforts to investigate it, the lodging of formal disciplinary charges of both harassment and insubordination, the sustaining of those charges at the pre-arbitration "step" proceedings, and the sustaining of the insubordination charge at arbitration. I further note that, on the one hand, plaintiff accuses the arbitrator of bias (presumably because the Authorities pay the arbitration fee), and thereby casts the arbitrator's decision to impose a one-day suspension (and to sustain the insubordination charge) as adverse action. On the other hand, plaintiff also relies on the arbitrator's rejection of

---

representative. Brenda Coleman, a Senior Director of the Law Department acting as Hearing Officer, sustained both charges but reduced the penalty from 20 to 15 days. At the step 3 grievance meeting on January 17, 2008, plaintiff appeared with a different Union representative. Hearing Officer Brian Pascarelli sustained the charges and penalty; plaintiff claims that Pascarelli had made up his mind to do so even before the meeting began.

[7] On the insubordination charge, the arbitrator's decision notes that plaintiff both "expressed discomfort that her manager and union representative were not present when she arrived" at the first informal meeting in Ruttman's office (on October 15) and that plaintiff nevertheless "did not request that the meeting be postponed or that she be given an opportunity to get" her representative. On the harassment charge, the decision concludes that, "it seemed clear during the arbitration that there was animosity between [Otero and plaintiff]," but that, "what was not clear and could not be established was whether the grievant uttered the alleged remark or not."

the harassment charge and corresponding reduction of the penalty as some sort of proof of actionable Title VII animus on her employer's part in having brought that charge in the first place. Correlatively, plaintiff also appears to complain that the conduct giving rise to the arbitrator-sustained insubordination charge would never have occurred had her employer not first brought baseless (in her view) harassment charges.

It is hornbook law that a litigant may seek to advance alternative or inconsistent theories, see Fed. R. Civ. P. 8(d), and that any ambiguity should be resolved in favor of the party against whom summary judgment has been sought. See, e.g., Gonzalez 1.5, 2010 WL 774997 at *1. Applying these principles to the threshold task of properly identifying what plaintiff is claiming, I shall assume that she seeks to advance all of the theories I have just inventoried, or whichever makes the strongest (relatively speaking) possible case for her, and further assume, for purposes of a prima a facie case, that some or all of the described employer activity qualifies as "adverse" for purposes of both the retaliation and discrimination branches of her claim.

Nevertheless, under the legal standards already referenced, defendants are entitled to summary judgment because plaintiff has no proof that any of these events or actions was causally related to her race, her gender, or the fact that she engaged in protected activity in 2006. Furthermore, even if plaintiff could survive at the prima facie stage, defendants would still be entitled to judgment in their favor because they have a solid, non-discriminatory reason for the whole episode—they surely could not have ignored Otero's complaint—and plaintiff has no proof that any or all of what ensued was a pretext for retaliation or discrimination.

B. The Hostile Environment Claim

Plaintiff's pleadings also include a claim captioned "hostile environment/discriminatory harassment." The claim appears to rest largely on the Otero incident, but because the caption

invokes a separate line of Title VII jurisprudence, see generally Kaytor, 609 F.3d at 546-47 (collecting authorities), I briefly treat this branch of the claim separately, for the sake of completeness.

Asked at her deposition about the alleged harassment, plaintiff testified:

> A: Ever since I commence my lawsuit, she's been on me for no reason
> Q: When you say "on you," what has she done?
> A: You know, intimidate, bullying.
> Q: Give me specific examples of what she did . . .
> A: The way she carries herself, the way she come [sic] toward you, the way she point her finger in your face.
>
> . . .
>
> Q: Anything else?
> A: She followed me.
> Q: That was on—
> A: On the 12th floor, for no reason. She just followed me all the way to the 12th floor.

Plaintiff also testified that Ruttman harassed other workers too:

> A: In my view, I think if we take the whole torts divisions, they'll sit down and they'll see – they'll agree that she does harass . .
> Q: How does she harass?
> A: Constantly, she will go to your cubicle, she'll talk to you like if you're some vagrant off the street. And she'll treat you—just because status quo, because she is an attorney, and we're just regular—if you don't have Esq. after your name, you're nobody.

These statements reflect plaintiff's view of the matter, but standing alone they are not the proof she requires to proceed past summary judgment; and even if they qualified as evidence, what they describe is not actionable under Title VII. See generally Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) ("hostile environment" is a "workplace [ ] permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to . . . create an abusive working environment") (internal quotations and citations omitted). Further, plaintiff has not shown that any such "harassment" or hostility occurred *because of her race or*

-12-

*gender*. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998) (Title VII is not "a general civility code for the American workplace," and "does not prohibit all verbal or physical harassment in the workplace," but "only 'discriminat[ion] . . . because of . . . sex [, gender, or one of the other statutorily specified grounds].'" Id. (quoting 42 U.S.C. § 2000e-2(a)(1)) (Supreme Court's emphases omitted).

## 08 CV 3935 ("Gonzalez 6")

Plaintiff claims that the Union breached it duty of fair representation during the above-described grievance and arbitration process and that it did so because of her gender, in violation of Title VII.

Title VII of course extends its proscriptions to labor organizations, making it unlawful for unions to "exclude, expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-2(c)(1)(c). A union's breach of its duty of fair representation may be actionable under the "otherwise [ ] discriminate" branch of this provision. See Goodman v. Lukens Steel Co., 482 U.S. 656, 667-69 (1987). To hold a union liable on this theory, however, the law requires proof "that discriminatory animus motivated the breach." Young v. New York City Board of Education, Dist. Council 37, No. 01 CV 6726 (FB), 2004 WL 1418386, *5 (E.D.N.Y. June 25, 2004) (collecting authorities).

Plaintiff complains that the Union, acting with illegal gender bias, did not send anyone to accompany her to the initial meeting with Ruttman on October 15, 2007, and thereafter intentionally chose poorly qualified individuals to represent her at each of step of her grievance

in order to sabotage any chance she had of prevailing. For its part, the Union, in detailed motion papers, presents facially plausible explanations for each of the choices that plaintiff challenges.

The dispositive point, however, is that plaintiff has not produced any evidence to support her allegation that *her gender* played a role in the way the Union handled her case. It is also not clear why plaintiff feels she has anything to complain about (with respect to her Union): plaintiff herself did not appear at step 1; at step 2, with union representation, she saw her penalty reduced by 25%; with respect to step 3, it was her own testimony that the Hearing Officer had already made up his mind before the hearing; and of course at arbitration, where the harassment charge and all but one day of the suspension were wiped away, plaintiff was essentially a winner. Thus, the record precludes a finding of bad faith or arbitrariness on the part of the Union, an essential element of the threshold claim of breach of the duty of fair representation. See, e.g., Barr v. United States Parcel Service, Inc., 868 F.2d 36, 43 (2d Cir. 1989) (breach of duty of fair representation occurs when a union's conduct toward its member has been "arbitrary, discriminatory, or in bad faith," quoting Vaca v. Sipes, 386 U.S. 171, 190 (1967)).

A final word is required to close out this sextet of lawsuits. Plaintiff is hardly the first litigant whose frequent filings have tested the limits of the Court's tolerance, and whose conduct nevertheless warrants something less than the harshest of its reprimands. Unquestionably, plaintiff continually feels that she has been wronged, and this is unfortunate by any measure. Clearly, her work experience and education have facilitated her familiarity with the processing of legal papers and the commencing of lawsuits and so she is hardly reluctant to complain when she feels she has been wronged. Nevertheless, the records in these six cases establish, quite clearly, that plaintiff labors under grave misapprehensions about the scope of the civil rights statute that

she invokes each time she experiences disappointment or discord on the job. As staunch guardian of fundamental civil liberties, Title VII of course keeps close watch on what happens in the nation's workplaces, but remains, for the most part, un-offended and even uninterested. The statute has important work to do, but says take your everyday quarrels and misunderstandings elsewhere. It is no plaything, and lawsuits in its name are not games.

The clock of course cannot be rolled back, nor can the resources expended on these suits be recaptured, but *plaintiff must take greater responsibility from this point forward.* Judicial decision-making is not a fool's errand: six meritless lawsuits by the same plaintiff involving the same set of workplace disputes, and six rounds of summary judgment to bring them to a close, are enough. Fair warning.

## CONCLUSION

For all of the foregoing reasons, the Court grants summary judgment in favor of defendants on all of plaintiff's claims in Gonzalez 4 (07 CV 4823), Gonzalez 5 (08 CV 3494), and Gonzalez 6 (08 CV 3495), each of the three-captioned actions.

SO ORDERED.

Dated: Brooklyn, New York
      September 2010

s/ Judge Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge